**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -v- | ) | No. 14 CR 103 |
| | ) | Hon. Virginia Kendall |
| GREGORY WEBB, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S RULE 29 MOTION**
**FOR JUDGMENT OF ACQUITTAL**

NOW COMES the Defendant, GREGORY WEBB, by and through his attorneys, MONICO & SPEVACK, pursuant to Rule 29 of the Federal Rules of Criminal Procedure, and respectfully requests that the Court enter an Order for a Judgment of Acquittal.

IN SUPPORT of this Motion, Defendant states:

## INTRODUCTION

1. On Defendant's motion, a court must enter a judgement of acquittal of any offense "for which the evidence is insufficient to sustain a conviction." Fed.R.Crim.P. 29(a). A motion pursuant to Rule 29(c) must be granted when "after viewing the evidence in the light more favorable to the United States, the trial court finds that no rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).

2. While a defendant moving for acquittal pursuant to Rule 29(c) has a heavy burden, it "is not insurmountable." United States v. Cassese, 428 F.3d 92, 98 (2nd Cir. 2005). In reviewing such a motion the court must assess the admitted evidence at trial to determine whether it supports the jury's finding that the defendant was guilty beyond a reasonable doubt. United

States v. Reed, 8754 F.2d 107, 11 (7th Cir. 1989). When it comes to the evaluation of a defendant's intent, circumstantial evidence must be heavily scrutinized:

> We will 'not permit a verdict based solely upon the piling of inference upon inference.' In this regard, we emphasize the indirect, inconclusive nature of the evidence in establishing Defendant's intent … Where the evidence as to an element of a crime is equally consistent with a theory of innocence as a theory of guilt, that evidence necessarily fails to establish guilt beyond a reasonable doubt.

United States v. Harris, 942 F.2d 1125, 1129-30 (7th Cir. 1991), quoting United States v. Delay, 440 F.2d 566, 568 (7th Cir. 1971). *See also* United States v. Miller, 761 F. Supp. 1368, 1380-81 (S.D. Ind. 1991) (granting motion for acquittal where circumstantial evidence was "equally strong to infer innocence" and failed to establish requisite intent).

3. In the instant case the Government charged Gregory Webb with 11 counts of wire and mail fraud, alleging he intentionally devised and participated in a scheme to bilk investors by making materially false representations as to the status and activity of his company, InfrAegis, of which he was president and CEO. Upon the close of its case in chief, the Government voluntarily dismissed counts six and eight, and on July 11, 2016, the jury returned guilty verdicts on the remaining nine counts.

4. Here, the evidence presented at trial was insufficient to support a guilty finding that Mr. Webb devised a scheme intending to defraud investors. As such, Defendant respectfully moves this court to enter a judgment of acquittal.

## ARGUMENT

5. "Whether a scheme to defraud exists is determined by examining whether the scheme demonstrated a departure from fundamental honesty, moral upright or fair play and candid dealings in the general life of the community." United States v. Hammen, 977 F.2d 379, 383 (7th Cir. 1992). In order to establish specific intent, the prosecution must demonstrate a

willful act on the part of the defendant with a specific intent to deceive or cheat. United States v. Duff, 464 F.3d 773, 786 (7th Cir. 2006). Therefore, to prove guilt beyond a reasonable doubt, the government need not solely prove a false statement, but also that it was the product of a willful presence of a "scheme to defraud." *See* United States v. Seidling, 737 F.3d 1155, 1161 (7th Cir. 2013).

6. The government failed to offer anything beyond insufficient circumstantial evidence "equally consistent with a theory of innocence" that Mr. Webb willfully engaged in a "scheme to defraud" in the performance of his duties at InfrAegis during the relevant period. At trial, the prosecution introduced a number of witnesses who were engaged in ongoing negotiations with Mr. Webb and his staff at InfrAegis. Among these were Washington Metropolitan Area Transit Authority ("WMATA") representative Kunj Behari, City of Chicago representatives Brian Murphy, Jonathan Lewin and Tony Ruiz, and City of Atlanta representative Caroline Fooshee, all of whom testified they were negotiating legitimate potential business deals and pilot programs with an eye toward future municipal contracts with InfrAegis for its iaMedium product. While none of these negotiations ultimately proved fruitful, these were legitimate ongoing negotiations being carried on, in many cases, for several years.

7. The Government left the impression that the iaMedium was nothing more than a pipe-dream, when in fact Mr. Lewin, Mr. Murphy and Mr. Ruiz all saw the iaMedium demonstrated at certain points in time. Mr. Behari provided documentation and admitted that InfrAegis had in fact *won* its Request for Proposals ("RFP") bidding process, enabling InfrAegis to enter direct contract negotiations with WMATA. Ms. Fooshee described a presentation that InfrAegis made to the Atlanta Urban Design Committee ("AUDC") regarding the use of the iaMedium in Atlanta, Georgia. Given that these negotiations were actually ongoing – even if

they ultimately proved fruitless – it cannot reasonably be said that Mr. Webb intentionally devised a scheme to defraud his investors.

8. The suggestion that Mr. Webb was operating some sort of fraudulent scheme made no sense – there was no "end game" here other than successful placement of operational iaMediums in selected urban areas. Had Mr. Webb's goals been realized, and the contracts and agreements formalized, InfrAegis would have been obligated to perform. The Government successfully piled "inference upon inference" to try and prove Mr. Webb's intent to defraud, while encouraging the jury to disregard completely his active, ongoing, and unrelenting efforts to place the very deals he described to his investors. Mr. Webb's enthusiasm for his product may have led him to try and fire up the troops at times, but according to every admissible investor witness who testified, Mr. Webb never explicitly said he had contracts signed or in place – they understood only that he was "close" to landing them or was "looking to" begin placing iaMediums in various cities. And while several investor witnesses stated they believed contracts were "just around the corner" or that "these were almost sure deals," every single admissible investor conceded he or she was aware at all times that these contract negotiations could fall through and nothing was a "done deal" until a contract was actually signed. These investors understood that Mr. Webb was "looking forward" – he reminded them of that numerous times. To the extent the investors were disappointed by the outcome, so was Mr. Webb.

9. Further undermining the notion that Mr. Webb set about to defraud his investors was the testimony from InfrAegis CFO James Zilka. Mr. Zilka testified that the reason these contracts did not materialize was because InfrAegis ran out of capital, *not* because they were ephemeral steps in a fraudulent scheme. Mr. Behari corroborated that testimony, testifying that WMATA wanted InfrAegis to deposit $615 million in escrow before it would enter into a

contract, as did Mr. Lewin's testimony that the Chicago pilot program would have required at least 10 fully functional iaMediums, a project that consulting engineer and acting Chief Technology Officer for InfrAegis, Dr. John Butterworth, testified would cost at least $5 million – an amount proven to be too high for InfrAegis to meet.

10. The Government belittled Mr. Webb's efforts to obtain financing through Donald Wamhof, but the fact is that no evidence introduced at trial refuted Mr. Webb's good faith belief that Mr. Wamhof was legitimate and capable of infusing InfrAegis with the capital needed to get these contracts realized. Their agreement was substantiated by a signed contract between Mr. Wamhof and Mr. Webb, outlining a stock sale in the amount of $8.7 billion that would buy out any skittish investors. Mr. Wamhof testified he intended to purchase the controlling stake in InfrAegis and that one condition of the sale would be to pay off investors for their shares. Mr. Wamhof may have provided an unorthodox method for raising this money, but no evidence supported the conclusion that Mr. Webb did not hold a genuine, good faith belief that he would in fact follow through with his purchase. If the Government's point was to suggest that Mr. Webb's statements about Mr. Wamhof eventually coming through were unworthy of belief, then Mr. Webb was as much a victim of those statements as the investors. Mr. Webb believed Wamhof; no evidence was presented otherwise.

11. Meanwhile, testimony was elicited from investment manager Michelle Butler from well-known venture capital fund DLM Capital Investments demonstrating that they made an offer to purchase a one-third stake in Bacteria Sciences Worldwide ("BSW"), an InfrAegis subsidiary, for $1 billion. DLM's offer helped to establish a reasonable price for the entirety of InfrAegis and its subsidiary, and gave additional support for Mr. Webb's good faith belief that

Mr. Wamhof would come up with the investment money so that Mr. Webb could buy out all of his investors over the years.

12. Furthermore, a bevy of evidence showed Mr. Webb and InfrAegis possessed patented, intriguing technology, directly contradicting the prosecution's false claim that none of the technology had value or was even functional. Dr. Butterworth, a former NASA engineer and developer of the iaMedium for InfrAegis, testified as to each functional component in the iaMedium, providing expansive detail how each one operated. Mr. Murphy and Mr. Lewin testified the technology would have been "revolutionary" and the city would be interested in this technology to this day. For his part, Mr. Behari testified WMATA would have entered into a contract with InfrAegis had it only come up with the $650 million deposit. Dr. Billingsley, former head of Research and Development at Dole Fresh Vegetables, who had frequent contact with Mr. Webb and InfrAegis scientists, testified further that BSW had valuable patents that Dole was interested in testing and perhaps acquiring. Unfortunately, testing and talk of purchases of the company by Mr. Wamhof caused this deal to fall through as well.

## <u>CONCLUSION</u>

Thus, abundant evidence at trial demonstrated that contract negotiations were ongoing between numerous entities during the relevant periods, that InfrAegis possessed valuable patents and technology of interest to every organization who testified, that investors understood the requisite risks for investing in InfrAegis, as it was a start-up, that they were aware that the municipal contracts could ultimately fail to pan out, and a contract for the sale of a controlling share of the company calculated via an earlier offer to purchase a portion of the company were in the works. Even more importantly, there was no evidence that Gregory Webb acted in bad faith

or that he set about to deceive investors. In fact, the opposite is both true and logical. Mr. Webb worked tirelessly to pitch his products and negotiate with several municipalities and believed sincerely in the value of his business. His statements to investors reflected his sincere beliefs about what the future held in store for the iaMedium; he advised the investors these were his forward looking statements and the investors understood that as well.

Just as in United States v. Harris, 942 F.2d at 1129-30, inferences that Mr. Webb was willfully running a scheme designed to defraud investors must be weighed against the evidence that his actions had a purely innocent explanation. Here, Mr. Webb was trying every day to get InfrAegis the contracts he described to the investors. His efforts did not ultimately prove successful, but there is no evidence that he undertook them in anything other than good faith. Mr. Webb's ongoing negotiations, valuable technology, and signed sale agreement to Mr. Wamhof, make for reasonable doubt as to whether Mr. Webb engaged in a fraudulent scheme or that his statements to investors were intentionally misleading. Defendant's Rule 29 motion should be granted, and a judgment of acquittal entered on all counts.

Respectfully submitted,
GREGORY WEBB

By: /s/ Scott J. Krischke
One of his attorneys

Michael D. Monico
Barry A. Spevack
Scott J. Krischke
MONICO & SPEVACK
20 S. Clark St., Suite 700
Chicago, IL 60603
312-782-8500
Attorneys for Defendant