IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| v. | ) No. 14 CR 103 |
| GREGORY WEBB, | ) Judge Virginia M. Kendall |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

On February 27, 2014, a federal grand jury indicted Gregory Webb on eleven counts of wire and mail fraud alleging that he committed fraud by luring investors into his company, InfrAegis, which was in the business of placing security devices in cities in order to protect citizens from radiological, biological, and chemical threats, as well as by using facial recognition software to aid in identifying offenders. Webb, as the CEO and president of InfrAegis, intentionally devised and participated in a scheme to bilk investors by marketing a product called the iaMedium that Webb promised would make city streets safer. At trial, the jury heard evidence that the technology Webb was selling did not exist in the form that Webb claimed it did and more importantly, that InfrAegis had not sold any of the devices to municipalities in spite of Webb's statements that he had contracted with numerous cities. InfrAegis had no capital, no legitimate promises of future capital to fund the development and implementation of the iaMedium and no contracts to place the devices on the street. By 2007, Webb knew that his aim to create a multi-billion dollar company was not possible and yet he knowingly made false representations about InfrAegis's impending deals and contracts in order to lure investors.

1

Upon the close of its case in chief, the Government voluntarily dismissed counts six and eight against Webb. On July 11, 2016, the jury returned a guilty verdict on the remaining nine counts. Webb now moves for a judgment of acquittal under Fed. R. Crim. P. 29(a) and (c), arguing that the evidence was insufficient to convict him. Alternatively, he requests a new trial under Fed. R. Crim. P. 33. Webb argues that four issues, when taken together, require a new trial: (1) the jury heard prejudicial evidence; (2) Webb could not cure the prejudice; (3) the Court rushed the jury to reach a verdict; and (4) that the Government's evidence lacked foundation. (Dkt. 103 at pp. 2; 4). The Court denies Webb's motions, and holds that the jury had sufficient evidence to support a judgment of guilt, and that the Court did not commit any error.

## I. Webb is Not Entitled to Judgment of Acquittal

Webb asserts that he is entitled to judgment of acquittal because the evidence was insufficient to support a guilty finding of a willful presence of a scheme to defraud. (Dkt. No. 104 at ¶¶ 4, 5). Webb faces "a nearly insurmountable hurdle" in claiming that the jury had insufficient evidence to conclude that he was guilty of the charges. *See e.g. United States v. Domnenko*, 763 F.3d 768, 772 (7th Cir. 2014) (citing *United States v. Torres-Chavez*, 744 F.3d 988, 993 (7th Cir. 2014)). Once a defendant is convicted, the Court reviews the evidence presented to the jury in the light most favorable to the Government and makes all reasonable inferences in the Government's favor. *See United States v. Cejas*, 761 F.3d 717, 726 (7th Cir. 2014) (citing *United States v. Larkins*, 83 F.3d 162, 165 (7th Cir. 1996)). The Court may overturn the jury's guilty verdict only if upon viewing the evidence in the light most favorable to the Government, "the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *United States v. Jones*, 713 F.3d 336, 340 (7th Cir. 2013) (quoting *United States v. Stevenson*, 680 F.3d 854, 855-56 (7th Cir. 2012)). Finally, "[i]t is up to the jury

to weigh the evidence and determine the credibility of the witnesses; [courts do] no second-guess the jury's assessment of the evidence." *United States v. Rollins*, 544 F.3d 820, 835 (7th Cir. 2008).

Webb argues that the government failed to offer anything beyond insufficient circumstantial evidence "equally consistent with a theory of innocence" that he engaged in a scheme to defraud. (Dkt. 104 at ¶ 6). Webb is incorrect in his conclusion that only circumstantial evidence was presented to the jury. In fact, numerous investors testified that Webb himself caused them to invest, that they in fact invested, and that they lost their investments. The Government corroborated much of this testimony with tape recordings of Webb himself as he boldly and without abandon rattled on for hours making false claim upon false claim about the contracts and the status of the devices in various cities. The city officials then corroborated that each statement was false in that the devices were not on the streets nor were there contracts to put them on the streets. All of this is direct evidence. At trial, the jury heard evidence that (1) InfrAegis ran out of capital and had no legitimate promise of future capital long before the investors put money into the company; (2) Webb himself made misrepresentations about the status of the company's capital and contracts; (3) the technology in the devices may have existed in separate forms in separate ways but never had existed in one composite device that could be placed on a city street; and (4) that Webb used the mails or interstate wire communication to further his scheme. Taking this evidence together, the jury found a scheme to defraud existed and that Webb directly made material representations, promises, and pretenses, and used the mails or wire communication to execute that scheme. *See United States v. Weimert*, 819 F.3d 351, 355 (7th Cir. 2016) (outlining the elements of mail and wire fraud). The evidence was direct and not circumstantial and the

jury correctly held that the overwhelming volume of the evidence including the Webb's own words heard on tape were sufficient beyond a reasonable doubt to convict.

   **A. InfrAegis ran out of capital.**

Webb concedes that his company had insufficient capital and yet attempts to use this fact to his advantage to explain why deals fell through. Although the lack of funding was the defense theory as to why deals were not completed, the direct testimony at trial instead stated otherwise including that the technology could not do what Webb said it could do. More importantly, even if it were true that deals were hampered with the municipalities due to lack of funding, Webb repeatedly misled his investors by telling them that deals were complete, technology had been ordered and devices were being used in multiple locations. The jury reasonably construed the depleted capital as evidence of Webb's scheme to defraud and his motivation to bolster the alleged deals. Financial records introduced at trial reflected that InfrAegis had only $38,000 in cash as of January 2007 and therefore each statement was a misrepresentation about the strength and liquidity of the company. (Government Ex. Chart 4). The Government also presented evidence that Webb did not have legitimate sources of future capital. InfrAegis's lack of capital, in it of itself, is not what constitutes the fraud. The fraud occurred when Webb made representations to investors about the status of negotiations and contracts, when in reality his company lacked the required capital to move forward.

Specifically, the Government presented evidence that Webb did not have a reasonable basis to rely on capital from Donald Wamhof, nor did he have capital coming from DLM Capital because instead DML accused Webb of fraud and no influx of capital ever occurred with DML.

1. Testimony of Donald Wamhof

Webb asserts that the Government disparaged Webb's efforts to obtain financing through Donald Wamhof, a retired mortgage broker who was going to provide $8.7 billion to the project. (Dkt. No. 104 at ¶ 10). The evidence demonstrated that, indeed, Webb had no reasonable basis to rely on capital from Wamhof. Wamhof testified that he intended to purchase the controlling stake in InfrAegis and that he would subsequently pay off investors for their shares. Webb argues that while Wamhof's plan may have been "unorthodox," he had a good faith belief Wamhof would follow through. *Id.* As a threshold issue, in rehashing whether Wamhof would follow through, Webb asks the Court to reweigh the jury's credibility determination. The Court is obliged to "defer[] to the jury's credibility determinations" and "cannot second-guess the jury's determination of which witnesses were credible and which were not." *United States v. Graham*, 315 F.3d 777, 781 (7th Cir. 2003). While the Court need not reweigh these determinations, a brief summary of Wamhof's testimony is illustrative. Wamhof reportedly missed deadline after deadline to come forth with the money for InfrAegis. (Dkt. No. 105 at p. 10 n.4.). Wamhof also testified that he told Webb that he intended to obtain the money by monetizing an international bill of exchange that had been guaranteed by the United States Treasury, but that he also told Webb that he had never been successful before in monetizing one of these so-called bills of exchange. The evidence also established that the United States Treasury did not guarantee such documents. *Id.* The jury reached the reasonable jury conclusion that the outlandish theory presented by Wamhof for future capital was not a real possibility and that it merely constituted another basis to show Webb's intent to defraud.

2. DLM Capital

Webb also did not have the support of legitimate venture capital firms. Webb contends that Michelle Butler from DLM Capital Investments made an offer to purchase InfrAegis's subsidiary, Bacteria Sciences Worldwide ("BSW"), for $1 billion. (Dkt. No. 104 at ¶ 11). At trial, however, Butler testified that Webb was supposed to deposit $50 million into a controlled bank account, but Webb never made the deposit. And, when DLM Capital had done nothing more than open the bank account, InfrAegis put out a press release stating that DLM Capital had purchased 30% of the total stock for $1 billion. At that time, Ms. Butler testified, the firm had not even began its due diligence process. Ms. Butler requested InfrAegis put out a revised press release stating that the deal had not yet commenced. InfrAegis complied with the request, but Ms. Butler was still compelled to send a cease and desist that stated, "You MUST cease and desist from using DLM as an investor in order to raise money. At this point you are committing fraud plain and simple." (*See* Gov. Ex. MB12). Ms. Butler explained, specifically, that InfrAegis displayed DLM's name on its website. Webb knew, once again, that his representations to lure investors did not match reality.

**B. Webb Made Material Misrepresentations about the Status of InfrAegis' Capital and Contracts.**

In order to keep the company afloat, Webb began lying to investors about the status of contracts and capital through offering memoranda, executive summaries, and during investor conference calls. (Dkt. No. 105 at p. 3). The Government introduced witnesses engaged in negotiations with Webb and his staff at InfrAegis. (Dkt. No. 104 at ¶ 3). Webb contends that InfrAegis was negotiating legitimate potential business deals and pilot programs with an eye toward future municipal contracts with InfrAegis for its iaMedium product. (Dkt. No. 104, ¶ 3). The jury heard evidence that Webb was not close to obtaining any business. (Dkt. No. 105 at p.

3). Contracting with municipalities is an extensive process. They do not get signed based on a meeting or submitting a proposal. Webb knew this because he was a long time employee of AT&T and had submitted various government proposals in that capacity. The Government produced evidence explaining the extensive request for proposal process, a process that Webb was familiar with and had made misrepresentations about. Webb made misrepresentations to investors about InfrAegis's agreements with: (1) the City of Chicago; (2) the City of Atlanta; (3) the Washington Metropolitan Area Transit Authority ("WMATA"); and (4) Dole. Finally, the Government presented evidence that investors relied on Webb's statements concerning the imminence of completed contracts in their decisions to invest in the company.

      1. Chicago

The Government presented evidence that InfrAegis was never close to signing a contract with the City of Chicago. Webb made his first attempt to sell iaMediums to the City of Chicago in August 2006. (Dkt. No. 105 at p. 3). At that time, he made a presentation to Cortez Trotter of the City of Chicago's Office of Emergency Management and Communications, who testified that he told Webb that the City was not interested in the technology because InfrAegis had never attempted to deploy the technology in a city, and also had never tested the product under cold weather conditions. *Id.* Trotter did not understand why the company was presenting the technology at such a premature stage. Next, Webb approached Brian Murphy and Mike Masters at the Mayor's office in the summer of 2007. (Dkt. No. 105 at p. 3). Murphy and Masters arranged for a demonstration of the iaMedium. *Id.* at pp. 3-4. There were discussions of issuing a Request for Production ("RFP"), but the City never initiated the procurement process, and those discussions ceased in 2008 shortly after Masters and Murphy sent Commander Lewin to a demonstration of the product. *Id.* at p. 4. At the demonstration, Commander Lewin proposed a

pilot program involving the deployment of ten iaMediums in the City. *Id.* at p. 5. Webb did not accept the proposal because he could not fulfill the request for ten iaMediums. *Id.* In fact, he could not even produce one functioning unit. Webb initiated relationships with people in the City of Chicago, but none of the evidence demonstrated he ever came close to obtaining a signed contract for the iaMedium.

2. Atlanta

InfrAegis was also far from a signed contract with the City of Atlanta. In October 2007, Defendant made a presentation to city officials, and the Atlanta Urban Design Committee made negative comments about the proposal. Ms. Caroline Fooshee, the city official responsible for looking into methods to sell street advertising in Atlanta, gave no further consideration after the presentation and never engaged in formal contract negotiations. (Dkt. No. 105 at p. 8). InfrAegis never began formal negotiations, but a 2007 offering memoranda represented that InfrAegis met with the city of Atlanta and "received verbal approval to negotiate contracts," and was in "various stages of due diligence or contract with negotiations" with various municipalities, including Atlanta. (Dkt. 105 at p. 7). And, during a June 8, 2008 investor call, Webb represented that once the Chicago RFP was issued, Atlanta would do a direct bid. The jury could reasonably infer that Webb knew these representations were untrue. *Cejas*, 761 F.3d at 726.

3. Detroit

InfrAegis made representations that Detroit was ready to deploy the iaMedium based only on a verbal agreement. The Government presented evidence that contracts with municipalities do not proceed based on verbal approval alone. Nevertheless, InfrAegis made representations in a presentation about the Detroit project that Michael A. Jackson, the Worldwide Executive Vice

President of Advertising at General Motors, would negotiate advertising agreements for the iaMedium in Detroit. (*See* Government Ex. TF-14, TF001-002070). Mr. Jackson testified at trial that he did not know who Webb was, and that he had never heard of InfrAegis.

### 4. WMATA

Mr. Kunj Behari, a representative of WMATA, admitted that InfrAegis won its RFP in the bidding process, and that InfrAegis was enabled to enter contract negotiations with WMATA. (Dkt. No. 104 at ¶ 7). Although this was the one situation InfrAegis actually won a RFP, the Government presented evidence that WMATA was still far from actually purchasing the iaMedium. That's because InfrAegis had to come up with $615 million for an escrow agreement. The jury heard extensive testimony about the escrow agreement. (*See e.g.* Government Ex. WMATA-6). In taking all favorable inferences for the Government, the escrow was required because WMATA was suspicious of InfrAegis, and for good reason, considering the evidence that the Government produced relating to the lack of capital in the company.

### 5. Dole

InfrAegis also misrepresented the stage of its negotiations with Dole. While the trial evidence focused largely on the iaMedium, the Dole relationship concerned another product. The M2D2 system is InfrAegis's molecular microbial DNA detection system, which could purportedly detect bacteria in foods in relatively short periods of time. While InfrAegis used Dole's name in pitches to investors (*see*, *e.g.*, Government Ex. TF-11), the product had never been tested outside of a laboratory. Dr. Roger Billingsley, an employee of Dole, explained to the jury that Dole's facilities, unlike a laboratory setting, are cold and wet environments. Just as the iaMedium had never been tested on city streets, the M2D2 had never been tested in the actual settings in which it would be deployed. When Dole agreed to enter into a Memorandum of

Commitment to do testing, InfrAegis never followed through on the agreement, but continued to use Dole's name in conversations with investors.

      6. Material Misstatements to Investors

When taking all of the evidence the Government presented about the actual status of InfrAegis's contracts, it becomes clear that Webb made material misrepresentations to investors. Under the wire and mail fraud statute, the Government shows a defendant made misrepresentations, and this conduct "reach[es] not only false statements of fact but also misleading half-truths and knowingly false promises." *Weimert,* 819 F.3d at 355. Despite the fact that there was never more than an offer for a pilot program from the City of Chicago, in August 2007, Webb told investors that he had received an "overwhelming endorsement" from the city, and that the contract should be signed "over the next few days; and a few days could be two weeks to three weeks. … That means we will be deploying 4,000 iaMedium systems in the City of Chicago, potentially up to 9,000." (Dkt. 105 at pp. 5-6; citing R.3 on Gov. Disk-2a). Webb also participated in the preparation and review of an offering memorandum, stating that "Ia has reached an agreement to deploy approximately 4000 iaMedium's through the metropolitan statistical area of Chicago." (Gov. Ex. IA-6.) Webb again made a representation during a December 2008 conference call with investors that 4,000 iaMedium units would be deployed "maybe the last week of December, but right now probably effectively January." (R. 8 on Gov. Disk-2c.) At that time, the City had only committed to the free pilot program. (Dkt. 105 at p. 6). The City had not issued an RFP or signed any contract, and Webb could not even fulfill the City's request for just ten iaMediums. Webb wanted investors to believe that the company was progressing beyond the "start-up" phase, and was ready to start generating revenue in order to keep the investments coming into the company. (Dkt. 105 at p. 8).

The investors, some of whom had as little as $5,000 invested, but some as much as $60,000, relied on material misrepresentations by Webb and other InfrAegis affiliates regarding impending contracts with municipalities when deciding to invest. Materiality has been defined in broad and general terms as having a tendency to influence or to be capable of influencing the decision-maker. *Neder v. United States*, 527 U.S. at 1, 16, (1999); *United States v. Seidling*, 737 F.3d 1155, 1160 (7th Cir. 2013). Evidence at trial demonstrated that investors relied on Webb's statements in deciding to invest their money in InfrAegis. Investor-witness Brenda Schwartz testified that Webb represented to her, multiple times, that contracts were already in place to purchase the iaMediums before she made her investment. She stated that she relied on the press release relating to DLM Capital when she decided to enlarge her investment. Ms. Schwartz wired another $50,000 (Government Ex. BS2) to InFrAegris, but she never received a stock certificate in return, and she only found out the deal with DLM was not going to go through *after* she made her investment. Mr. Gregerson also testified that he relied on investor materials when investing in the product, including statements that the company had funding ready to go. (*See* Gov. Ex. DG6 and DG8). Webb also made promises to witness Mr. Klehr, who invested $15,000 in InfrAegis, but never received stock certificates or any other paperwork acknowledging his investment. (*See* Gov. Ex. TK1) (March 13, 2009 email conversation between Mr. Klehr and Webb assuring Mr. Klehr that the State of Illinois completed its investigation and that InfrAegis complied with all regulations). Mr. Kowal testified that the statement that IA had two major metropolitan cities ready to deploy the system influenced him to invest in InfrAegis. Mr. Matykiewicz also invested in InfrAegis in on November 6, 2007 and February 18, 2008 based on Webb's investor phone calls, but Matykiewicz became concerned when he never received any sort of paperwork and no one at InfrAegis would return his phone

calls. (*See* Gov. Ex. TM 1 and TM 2, T. Matykiewicz checks for InfrAegis stock). The jury was reasonable in finding that the evidence of these material misstatements as evidence of Webb's scheme to defraud. *Weimert,* 819 F.3d at 355.

### C. There were Issues with the Product itself.

According to Webb, "[a] bevy of evidence" showed the iaMedium technology was patented and intriguing. (Dkt. No. 104 at ¶ 12). The evidence once again showed that Webb made material misrepresentations about the products. To Webb's claim that the product was patented, Dr. Butterworth, InfrAegis's Chief Technology Officer, acknowledged that most of the technology, apart from the radiological detector, was not proprietary to InfrAegis. (Dkt. 105 at p. 10). Murphy, Masters, and Commander Lewin each testified that the iaMedium *would* have been a revolutionary product *if* it could perform all of the functions Webb represented that it could. (Dkt 105 at p. 10). But the technology did not exist, even at the time of the trial. *Id.* The witnesses saw a product, but never the revolutionary set of deliverables. The jury heard testimony that InfrAegis had difficulty getting the advertisement or notification systems to work in the product. Mr. Lewin testified that he never actually determined whether the product he saw worked. Mr. Rodrigues, who worked for InfrAegis for roughly six months, testified that components of the iaMedium were missing, including the explosive and biological detection capabilities. Dr. Butterworth, InfrAegis's chief technology officer, further admitted that the product was never tested on a city street, nor in cold weather conditions. Even though the technology did not exist, Webb knowingly sold it to investors as though it did.

Additionally, there was no reason to believe that even if contracts materialized, the business model would be viable. InfrAegis premised the business model on the notion that the iaMedium would generate revenue for the company by displaying advertisements. Mr. Nerup, the vice

president of business development at AT&T in the 2000s, testified that if InfrAegis was not able to advertise, the revenue number would have zeroed in AT&T's financial analysis of the company. Webb represented to investors that the revenue would be well over $1 billion dollars for the 4,000 systems he said Chicago was to deploy. But another company, J.C. Decaux, already paid the City for the exclusive right to display advertisements on public property through 2009. (Dkt. No. 105 at p. 11). In other words, InfrAegis would not have been able to deploy units and sell advertising until 2010, and, even then, would have to compete for locations and advertisers. *Id.* What's more, the president and CEO of J.C. Decaux testified that actual advertising revenues in the City of Chicago were less than $ 150 million. It is hard to imagine, then, how a reasonable jury could accept Webb's billion dollar estimations.

### D. There was evidence of mailing or wiring in furtherance of the scheme.

The Government charged nine separate mailings or wirings in furtherance of the scheme. The parties stipulated to David House's wiring of investments to InfrAegis, and House testified that InfrAegis sent House stock certificates. The Government also produced evidence that Brian Caine wired money to InfrAegis and, in return, received a FedEx shipment of stock certificate from InfrAegis. Finally, the Government produced evidence of the mailing of stock certificates from InfrAegis to Michele and Monte Van Dyke. The Government produced sufficient evidence for a jury to conclude that Webb caused mailings and interstate wire communications in furtherance of his scheme. *See Weimert*, 819 F.3d at 355.

## II. The Court Did Not Err Such that a New Trial is Necessary

Rule 33(a) of the Federal Rules of Criminal Procedure states that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. Pro. 33(a); *see also United States v. Berg*, 714 F.3d 490, 500 (7th Cir.

2013); *United States v. Smith*, 674 F.3d 722, 727 (7th Cir. 2012). "A defendant is entitled to a new trial if there is a reasonable possibility that a trial error had a prejudicial effect upon the jury's verdict." *United States v. Van Eyl*, 468 F.3d 428, 436 (7th Cir. 2006). However, "[a] jury verdict in a criminal case is not to be overturned lightly, and therefore a Rule 33 motion is not to be granted lightly." *United States v. Santos*, 20 F.3d 280, 284 (7th Cir. 1994) (citations omitted).

Webb argues that any of the individual errors at trial would alone call for judicial relief, and when viewed collectively clearly require a new trial. (Dkt. No. 103 at p. 1) (citing *United States v. Allen*, 269 F.3d 842, 847 (7th Cir. 2001). None of the alleged errors, even when taken together, suggest Webb did not have a fair trial.

### A. Robert Winslow's Testimony Was Not Prejudicial.

Robert Winslow was a trader at the Chicago Mercantile Exchange at the time he met Webb. Winslow made an investment in InfrAegis after Webb pitched the iaMedium to Winslow and approximately 20 other potential investors. With money at stake, Winslow was eager to see InfrAegis actualize contracts, and so he arranged for Webb to participate in a demonstration of the iaMedium for Cortez Trotter, Chief Emergency Officer for the City of Chicago, in August 2006. (Dkt. No. 105 at p. 3). His testimony at trial went directly to Webb's state of mind when he began to pitch the iaMedium. Winslow's testimony also supported the Government's theory that Webb did not have a reasonable basis for representations that contracts with the City of Chicago were near final.

1. The Timing of Winslow's Testimony

Webb argues that he was unfairly prejudiced when the Government introduced testimony from Mr. Robert Winslow in violation of Fed. R. of Evid. 404(b). (Dkt. No. 103 at p. 2). Webb contests that the time period which Mr. Winslow's testimony concerns goes beyond the scope of

14

the indictment, because the indictment references 2007. (Dkt. No. 103 at p. 3). Mr. Winslow testified that he invested in IntelAgents, the precursor to InfrAegis in 2005 and early 2006. The indictment actually states that the scheme began "no later than" 2007. The year 2007 then, was the *latest* date of the inception of the scheme, and so the Court agrees it is clear that evidence of the scheme in 2005 and 2006 is admissible. (Dkt. 105 at p. 13).

Moreover, even though Winslow invested earlier than the other investors who testified at trial, his testimony goes directly to Webb's intent to defraud. The testimony was particularly relevant to contracts that InfrAegis claimed to have been awarded, or expected to be awarded. Winslow testified that in approximately October 2006, Webb represented InfrAegis had secured contracts at a meeting at the Chicago Mercantile Exchange with twenty-five of Mr. Winslow's colleagues. Winslow recalled that Webb specifically made reference to contracts with Chicago during this meeting, and that InfrAegis was in the final stages of negotiation with Chicago. This was a key misrepresentation throughout the scheme, and Winslow's testimony was therefore direct evidence of Webb's relevant conduct. Winslow explained that he helped arranged the meeting between InfrAegis and Mr. Trotter in August 2006, discussed *supra*, during which Mr. Trotter flat-lined any reasonable hope for a Chicago contract.[1] (Gov. Exhibits MM-4; MM-5; WK-3a). Winslow's testimony demonstrates that Webb was pitching the product to investors in 2007 and 2008, when he knew two years earlier that it was not going to be used by the city of Chicago. The evidence was not outside the scope of the indictment, and was directly relevant to the scheme and was not 404(b) evidence.

---

[1] Mr. Trotter represented, and the Government believed that this was the actual time period of the presentation, and that Mr. Winslow was wrong in stating that it occurred in 2008.

2. Mr. Winslow's Testimony regarding September 11, 2001

Webb also contends that he was unfairly prejudiced when Winslow testified that Webb "preyed upon people's fears over 9/11" to defraud them. (Dkt. No. 103 at ¶ 3). According to Webb, the Court should have concluded that based on this testimony, Webb was denied a fair trial. *United States v. Sandoval*, 347 F.3d 627, 631 (7th Cir. 2002). Webb relies on *Sandoval*, a case that is not helpful to him. In *Sandoval*, the issue was whether the prosecutor's comments during opening and closing statements constituted prosecutorial misconduct. This case is distinguishable in that instead of the prosecutor, here, the witness, Winslow, made the comment during a direct examination in response to a prosecutor's open-ended question. The facts do not raise the same danger of prosecutorial misconduct. Moreover, in *Sandoval*, the court held that even if the prosecutor's statement was improper, the jury instructions would have ameliorated any prejudice. *Id.* The Court also ameliorated the potential prejudice of Winslow's comment. The Court immediately sustained defense counsel's objection to the unsolicited comment, and instructed the jury to disregard the testimony. If the Seventh Circuit observes that even the prejudicial comments of a prosecutor during opening and closing statements can be ameliorated, as they did in *Sandoval*, then certainly in a two week trial with 36 witnesses, Winslow's statement did not deny Webb a fair trial. More importantly, however, it was Webb himself who injected people's fears of 9/11 into the case. In fact, the pitches he gave to investors and to the municipalities all pertained to protecting the public in a post 9/11 era where detecting chemical attacks and other terrorist attacks had become part of every municipality's obligations. Webb's own words on the recordings reflect his desire to prey upon those fears and to use them to get investors to put forth their money and municipalities to contract for his product. In the interest of not having the issue become overly prejudicial, the Court kept such arguments out of the trial,

16

yet, the Court would have been well within its discretion to include them. No error was committed and no prejudice occurred.

Webb nevertheless claims that because he did not get a chance to cure the evidence, he should have a new trial. But Webb's solution to a non-issue would only have created a problem. Webb wanted to elicit testimony from his wife, Barbara J. Webb, as to her knowledge of her husband's patriotic motive in founding InfrAegis. Webb's wife would have explained that she observed the effect of the September 11, 2001 terrorist attacks on her husband, and that he in fact wanted to protect the U.S. citizens when he started his company. (*Id.* at ¶ 4). James Zilka was also prohibited from testifying about InfrAegis's mission to utilize technology to better protect communities from terrorism. *Id.* But character evidence of this kind "is usually inadmissible, because it is usually off the point. It does not speak to the question of whether the accused committed a crime." *United States v. Burke*, 781 F.2d 1239 (7th Cir. 1985). Giving Webb the chance to produce evidence of his patriotism does not make it more or less likely "the existence of some fact that matters" in determining whether he committed mail fraud. *Burke*, 781 F.2d at 1242. Instead, the Court ruled that the character evidence would simply encourage jury nullification by either persuading the jury that Webb could not, as a patriot, be capable of fraud, or that his fraud should be excused because he was acting in response to terrorism – neither of which is permissible.[2]

### B. The Government Did Not Change its Theory.

Webb also claims prejudice because the Government went from stating that InfrAegis was a "sham" company to finally arguing that InfrAegis had the technology but could not get the

---

[2] The Court also notes that the evidence Webb presented at trial explicitly stated that IA's principles and "core mission" is "Saving Lives." *See e.g.* (Government Ex. WMATA-4b). InfrAegis even trademarked, "Saving Lives – Protecting Assets." Nothing prohibited Webb's counsel from relying on and emphasizing the InfrAegis principles, which could have Webb's desired effect of curing prejudice, but without using impermissible character evidence.

products to market. (Dkt. 103 at ¶ 5). Before even looking at the trial evidence, the Court notes that Webb has not made a case that the difference between a sham company and a company with a technology it could not actually put into the market is of any consequence to the verdict. But the Government's opening statement parallels its closing. The emphasis in both was on Webb's conduct relating to contracts for InfrAegis's technologies; the technologies themselves, the Government explained, were just a small part of the case. The Government concedes in its opening that InfrAegis was a small company in the business of developing products to sell, and that the company possessed technology, but that the jury would hear evidence about where those technologies were in terms of development and production.

### C. The Court's Scheduling Discussion was Not Prejudicial.

Webb contends that "Defendant was unfairly prejudiced when the Court advised the jury near the close of business on Friday night that they could stay longer to consider a verdict so as to avoid coming back on Monday – a day in which the Court advised the jury that it was starting another trial." (Dkt. 103 at ¶6.) Webb grossly mischaracterizes the Court's statements.

At approximately 4:00 p.m. on Friday, July 8, the Court informed the jury about the schedule for jury deliberations. The jury had been meeting from 9:15 a.m. to 5 p.m. each day for two weeks during the trial. The Court informed the jury that they could stay and deliberate until 6 p.m. (which was past their usual hour) but that after 6 p.m. the US Marshals would reduce the number of security personnel and therefore they would need to go home. The Court went on to explain that 9:00 a.m. would be the point at which deliberations would begin going forward – therefore, implicit in these instructions was that the jury *would* return on Monday and begin deliberations at 9:00 a.m. During this discussion, the Court never made any statements that the jury could "avoid coming back on Monday" (Dkt. 103 at ¶ 6), and did not make reference to the

18

next trial on the Court's docket. (*Id.*) And, in fact, the jury did return on Monday and rendered the guilty verdict.

There is nothing coercive about the Court's comments because it merely informed the jury of the expected schedule new stage of the case. *See United States v. Crotteau*, 218 F.3d 826, 834 (7th Cir. 2000) (there was no evidence of coercion by the court when the trial judge informed the jury at approximately 4:45 p.m. that deliberations would end for the day at 6:00 p.m. and resume the following morning). Each day the Court informed the jury as to what the hours of work for the jury would be for the following day. This is both the courteous and efficient manner in which to handle a jury of individuals who need to plan their coming and leaving the courthouse according to those instructions.

Webb's belief that this neutral instruction somehow had "the unfortunate effect of suggesting to the jury that the Court may have thought the verdict should be rendered very quickly and that the verdict should be guilty" is conjecture and meritless. (Dkt. 103 at ¶ 6.) The jury instructions made clear that the jury was to decide the case on its merits. The Court informed the jury that it had two duties: first, to decide the facts from the evidence seen and heard in court; second, to apply those facts and decide if the government proved the defendant guilty beyond a reasonable doubt. Further, the Court instructed the jury not take anything said or done by the Court during trial as an indication that the Court had an opinion about the evidence or what the verdict should be. Each juror was to give fair and equal consideration to all of the evidence. The instructions encouraged complete deliberation, and the Court made only neutral statements about scheduling. There was no rush. No error was committed.

### D. The Trial Exhibits Did Not Lack Foundation.

Finally, Webb argues that the Court erred by allowing the Government to introduce Offering Memoranda and other exhibits with no foundation or proof that the documents were ever in fact distributed to investors. (Dkt. No. 103 at ¶ 7). These documents were entered into evidence without objection. Witnesses such as the investors testified at trial that the documents were distributed to them. And, even if the Court accepts that investors did not receive those documents, the documents still support Webb's intent to defraud because he reviewed them. This may call into question the weight of that evidence, but not its admissibility, as Defendant contends. No documents, therefore, were improperly admitted.

### CONCLUSION

For the reasons stated herein, the Court denies Webb's motion for a judgment of acquittal (Dkt. No. 104), and a new trial. (Dkt. No. 103.)

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: 12/21/2016